# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

DANNY RAY WOLFE,                          )
                                          )
                    Petitioner,           )
                                          )
          vs.                             )     Case No.  15-0472-CV-W-RK-P
                                          )
RONDA PASH,                               )
                                          )
                    Respondent.           )

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS
## AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, a convicted state prisoner currently confined at Crossroads Correctional Center in Cameron, Missouri, has filed *pro se* this federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2006 convictions and sentences for two counts of first-degree murder, two counts of armed criminal action, and one count of first-degree robbery, which were entered in the Circuit Court of Camden County, Missouri.  Petitioner's convictions and sentences were affirmed on direct appeal.  *State v. Wolfe*, 344 S.W.3d 822 (Mo. Ct. App. 2011); Doc. 11-15. [1]  Petitioner's motion for post-conviction relief filed pursuant to Mo. Sup. Ct. R. 29.15 was denied following an evidentiary hearing (Doc. 11-17, pp. 51-78) and that denial was affirmed on appeal therefrom (*Wolfe v. State*, 446 S.W.3d 738 (Mo. Ct. App. 2014); Doc. 12-18).

Petitioner raises eight grounds for relief.  Doc. 1, pp. 9-18.  Respondent contends that Ground 1 is not cognizable and, alternatively, is without merit, that Ground 4 is procedurally defaulted and, alternatively, is without merit, and that Grounds 2, 3, and 5-8 are without merit. Doc. 9.

---

[1] The state court opinions cited herein relate to Petitioner's criminal proceedings following his second trial.  Petitioner's first trial ended in convictions on all counts, but the judgment was vacated in a subsequent post-conviction proceeding. *See Wolfe*, 344 S.W.3d at 830; *Wolfe v. State*, 96 S.W.3d 90 (Mo. 2003).  Petitioner was retried in 2006 and was again found guilty on all counts.  *See Wolfe*, 344 S.W.3d at 830.

## Statement of Facts

In affirming the denial of post-conviction relief, the Missouri Court of Appeals, Southern District, set forth the following facts:

In February 1997, Mr. and Mrs. Walters had a Cadillac for sale. That same month, [Petitioner] had unsuccessfully offered to sell Gregory Addington a .25 caliber pistol.

Late on the night of Wednesday, February 19, 1997, Jessica Cox went to a bar. [Petitioner] approached her there and introduced himself. [Petitioner] wanted Ms. Cox to sell drugs for him, and at around 1:00 a.m. on Thursday morning, Ms. Cox left the bar with [Petitioner] in his truck to get the drugs. They eventually wound up at [Petitioner's] hotel, where [Petitioner] donned a camouflage jacket and nylon "parachute" pants.

[Petitioner] and Ms. Cox left the hotel around 4:30 a.m. They stopped at a gas station, and [Petitioner] told Ms. Cox to buy a pair of jersey gloves. They proceeded to Greenview, where [Petitioner] pointed out the Walters residence and said that they would be going there. [Petitioner] drove past the residence and parked by the road. [Petitioner] told Ms. Cox that Mr. and Mrs. Walters had money, they were expecting him early in the morning to test-drive the Cadillac, and that he intended to rob them. [Petitioner] put on gloves; he also handed Ms. Cox a pair of gloves, telling her that she should wear them.

Around 6:00 a.m., the pair returned to the Walters residence, and [Petitioner] parked behind the Cadillac. Mrs. Walters answered the door, and Mr. Walters walked out to the Cadillac. [Petitioner] told Ms. Cox to join them, and Mr. Walters invited Ms. Cox to drive the car. Ms. Cox asked Mr. Walters to come with her on the test drive, and he agreed to do so. Mr. Walters was riding in the front passenger seat, and [Petitioner] was sitting behind him in the back seat.

As Ms. Cox drove back toward the Walters residence, she "heard a loud bang[.]" When she looked over, Mr. Walters took "his last breath" and put his head down. Ms. Cox also saw something that "looked like a barrel of a gun." [Petitioner] took Mr. Walters's wallet and remarked, "[T]his guy is loaded."

When they reached the Walters residence, [Petitioner] told Ms. Cox to get into his truck, and [Petitioner] went inside the house. Ms. Cox heard a "commotion." She also heard other noises, including a shot, emanating from the house. After about seven or eight minutes, [Petitioner] came out of the house, and he was carrying a safe. He put the safe in the bed of his truck and drove to a wooded area. [Petitioner] took the safe and some tools into the woods, and Ms. Cox saw him open the safe with the tools. [Petitioner] put some items from the safe into his pocket, leaving the safe and some papers on the ground.

2

[Petitioner] then drove to some condominiums, where he asked the custodian for a key to a storage shed. The custodian observed that [Petitioner] was wearing silky, nylon pants.

[Petitioner] went to another location at the condominiums for five to ten minutes. When he returned to the truck, [Petitioner] was wearing white painter's pants and a sweatshirt. [Petitioner] told Ms. Cox that he had thrown the gun into the lake. Around 8:00 a.m., [Petitioner] drove to a shopping center near Camdenton and bought some paint. Ms. Cox asked [Petitioner] to take her to the Osage Beach Hospital, where he dropped her off and gave her $540 in cash. [Petitioner] told Ms. Cox that he would kill her and her family if she told anyone what had happened. Ms. Cox called some friends and told them that she had been kidnapped.

Around 8:30 a.m. on February 20th, a propane gas deliveryman, Kenneth Stoller, drove past the Walters residence and noticed a man sitting in the front passenger seat of the Cadillac that was for sale. When Mr. Stoller came back from the opposite direction, at around 10:30 a.m., he still saw a man sitting in the front passenger seat. He thought it odd that the man had not moved.

A mail carrier, Charles Lunaberg, usually delivered mail to the Walters mail box between 1:30 and 3:30 p.m. He knew that they picked their mail up daily as their box on the highway was always empty the next day when he delivered their mail. That familiar pattern was broken on Thursday, February 20, when Mr. Lunaberg noticed that the mail from the day before was still in their box. The following day, the accumulated mail was still in the box.

On an occasion that occurred after [Petitioner] had offered to sell the gun to Mr. Addington, [Petitioner] went into the bar that Mr. Addington managed and exchanged quarters that 'were in some sort of bags' for approximately $25 in currency.

On Sunday, February 23, Charles Rickey went to the Walters residence twice to dump septic tank waste on their field. Mr. Rickey had an agreement with Mr. Walters to pay for each load that he dumped. Mr. Rickey dumped his second load around noon. As he was leaving, he saw Mr. Walters sitting in the passenger side of the Cadillac. Mr. Rickey approached the car and noticed dried blood on Mr. Walters's clothes. Mr. Rickey opened the door and touched Mr. Walters, who "felt like he was all like concrete." Mr. Rickey called 9–1–1. His father, who was with him at the time, went to the door of the house and called for Mrs. Walters, but he received no response.

Officers recovered a spent shell casing from Mr. Walters's collar, and a live .25 caliber round from the back seat of the Cadillac. Officers located Mrs. Walters's body inside the house. It was covered in blood and surrounded by more blood on the floor. A shotgun lay near her feet, and a bloody knife was laying on the floor in the kitchen. Tennis-shoe type footprints were present on the kitchen floor. The prints did

3

not match the shoes on Mrs. Walters's body. Autopsies later indicated that Mr. Walters died from a gunshot wound to his head that perforated his spinal cord. Mrs. Walters had a shotgun wound, but she died from a stab wound that penetrated her heart.

On February 27, Ms. Cox contacted an attorney. Her attorney subsequently secured an agreement from the prosecutor that granted Ms. Cox immunity from prosecution in exchange for her promise to provide truthful testimony against [Petitioner]. That same evening, Ms. Cox led officers to the safe. Along with the safe, the officers found papers bearing Mr. Walters's name, a bag of quarters, and some loose quarters.

The police recovered items from a dumpster at [Petitioner's] hotel, including a live .25 caliber round, a lease agreement bearing [Petitioner's] name, a camouflage coat, gloves, a partially-full box of .25 caliber ammunition with a black hair inside, and another box of .25 caliber ammunition. A search of a storage shed at the condominium where paint was stored produced black nylon pants and a pair of tennis shoes. Laboratory analysis subsequently showed that the shoeprints on the kitchen floor of the Walters home were consistent with the tennis shoes recovered from the shed. A search of [Petitioner's] truck yielded some brown jersey gloves.

The police interviewed [Petitioner], who initially denied knowing Ms. Cox. He subsequently admitted that she had accompanied him to his hotel room, but he denied taking Ms. Cox to the condominiums.

*Wolfe*, 446 S.w.3d at 741-43 (footnotes omitted, alterations added); Doc. 12-18, pp. 4-7.

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. *Graham v. Solem*, 728 F.2d 1533, 1540 (8th Cir. en banc), *cert. denied*, 469 U.S. 842 (1984). It is Petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254(e)(1).[2] Because the state court's findings of fact have fair support in the record and because Petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers

---

[2] In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to a judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

to and adopts those factual conclusions.

## Ground 1

In Ground 1, Petitioner argues that Officer Gary Bowling omitted material facts from the search warrant application, thereby misleading the issuing judge as to the existence of probable cause. Doc. 1, p. 9. Respondent contends that Ground 1 is not cognizable in federal habeas pursuant to the doctrine established by *Stone v. Powell*, 428 U.S. 465, 494 (1976), which held that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Doc. 9, p. 25. Respondent contends that the state courts properly held a hearing and decided Ground 1 under the standard set forth in *Franks v. Delaware*, 438 U.S. 154 (1978). Doc. 9, pp. 25-31. In *Franks*, the United States Supreme Court held that, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 48 U.S. at 155-56.

The Missouri Court of Appeals, Southern District, summarized Petitioner's state-court challenge to Officer Bowling's warrant application as follows:

> In March 2006, Defense counsel filed a motion to quash the search warrants on the ground that the State failed to include seven relevant facts in the affidavit supporting the warrant application. Counsel alleged that these facts were omitted with the intent to make the affidavit misleading and that the affidavit would not have demonstrated probable cause for the searches if these additional facts had been included.
>
> In April 2006, the court held a hearing on the motion. Deputy Bowling testified that he applied for the above-mentioned warrants on February 27th and 28th. Deputy Bowling acknowledged that he had contact with Cox 19 years earlier when she filed a false report with police as a juvenile. The warrant applications did not refer to the 1987 incident, Cox's immunity agreement or the initial false story that she told her friends. Deputy Bowling also had information that, during the course of the investigation into the

5

Walters' murders, other officers had interviewed witnesses who claimed to have seen the Walters alive after the time of death reported by Cox. The trial court denied the motion to quash the search warrants.

*Wolfe*, 344 S.W.3d at 832; Doc. 11-15, p. 14. After Petitioner was convicted, he appealed the denial of the motion to quash and was denied. *Wolfe*, 344 S.W.3d at 830-33; Doc. 11-15, pp. 12-17. In denying Ground 1, the state appellate court found that Petitioner failed to establish that Officer Bowling omitted material facts from his application with the intent of making that document misleading or that the inclusion of the omitted facts in Officer Bowling's application would have shown that there was no probable cause to conduct the searches. *Wolfe*, 344 S.W.3d at 833; Doc. 11-15, p. 17.

In sum, the state court record indicates that Petitioner was given a full and fair opportunity to litigate his Fourth Amendment objections before the state courts. As a result, this Court is precluded from considering Ground 1, and the mere fact that the state courts may have erred on the issue (which does not appear to be the case) does not entitle Petitioner to habeas relief. *See e.g., Matthews v. Workman,* 577 F.3d 1175, 1194 (10th Cir. 2009) (concluding that *Stone* precluded consideration of habeas claim that an affidavit in support of search warrant was obtained with false statements and intentional material omissions in violation of the Fourth Amendment under *Franks*, because the habeas petitioner was afforded a full and fair opportunity to litigate the claim before the state courts); *Moreno v. Dretke,* 450 F.3d 158, 167 (5th Cir. 2006) (same). Petitioner's only avenue for federal review to determine whether or not his Fourth Amendment claim had been correctly decided would have been a petition for certiorari to the United States Supreme Court after seeking review from Missouri's highest court on direct appeal, which Petitioner did not bring. *See Poitra v. North Dakota*, 79 F. Supp. 3d 1021, 1044 (D.N.D. 2015). Therefore, Ground 1 is barred by the doctrine set forth in *Stone* and is denied.

6

In Ground 2, Petitioner contends that the evidence was insufficient to support his convictions, in that the state's theory of the time of the murders was contradicted by scientific evidence. Doc. 1, pp. 9-11. Claims of insufficient evidence to support a verdict face "a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012). The first layer of deference is on direct appeal, where "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.'" *Id.* (quoting *Cavazos v. Smith,* 565 U.S. 1 (2011)). A second layer of deference then applies on habeas review, where "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." *Id.* Rather, "[t]he federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.*

The Missouri Court of Appeals, Southern District, denied Ground 2 as follows:

> At trial, the jurors were provided with five estimates about when the Walters were killed. Dr. Jungels estimated that the Walters had been killed 24 to 36 hours before they were discovered, but he explicitly disclaimed any expertise in making time of death determinations. Dr. Michael Zaricor (Dr. Zaricor) estimated the Walters' time of death to have been between 36 hours to one week prior to the discovery of their bodies. Dr. Thomas Bennett (Dr. Bennett) opined that the Walters were likely killed either on February 20th or 21st. Dr. Dix saw nothing during his examination of the Walters' bodies that would be inconsistent with them being killed on the morning of February 20th. [Petitioner's] expert, Dr. Samuel Gulino (Dr. Gulino), estimated the Walters' time of death to have been between 24 and 36 hours before their bodies were discovered. He thought it very unlikely that the Walters had died more than 48 hours before they were found.

> [Petitioner] contends that: (1) Dr. Gulino's testimony established to a scientific certainty that the Walters were killed at 1:00 a.m. on February 21st; and (2) in the face of such evidence, no rational juror could find that [Petitioner] killed the Walters at 6:00 a.m. on February 20th as the State theorized. [Petitioner] asserts that "[w]hile the State offered testimony from Cox that pointed the finger at [Petitioner], to accept that testimony required the jury to invent a factual scenario that wholly ignored the facts and scientific reality." According to [Petitioner], "[t]he facts and inferences all lead to the impossibility

7

of Cox's tale." We disagree.

On appellate review, this Court must determine whether there was sufficient evidence to permit a reasonable juror to find guilt beyond a reasonable doubt. *State v. Belton*, 153 S.W.3d 307, 309 (Mo. banc 2005). We view the evidence and all reasonable inferences derived therefrom in a light most favorable to the verdict and disregard any contrary evidence and inferences. *State v. Goodin*, 248 S.W.3d 127, 129 (Mo. App. 2008).

We have already recited the favorable evidence and inferences supporting the jury's verdicts. Based upon our review of the record, the State made a submissible case on the charges of first-degree murder, armed criminal action and first-degree robbery. An appellate court does not act as a super juror with veto powers; instead, the decision made by the trier of fact is given great deference. *State v. Bateman*, 318 S.W.3d 681, 687 (Mo. banc 2010). [Petitioner] is asking this Court to ignore the applicable standard of review and decide that Cox's testimony was not credible because it conflicted with Dr. Gulino's opinion as to when the Walters were killed. That is not our function. "Reliability and credibility are issues for the jury." *State v. Miller*, 139 S.W.3d 632, 635 (Mo. App. 2004). The jurors can "believe all, some, or none of any witness's testimony in arriving at its verdict." *State v. Pullum*, 281 S.W.3d 912, 915 (Mo. App. 2009). Dr. Gulino's expert opinion conflicted with Cox's eyewitness account of when the Walters were killed, as well as other circumstantial evidence and expert opinions tending to prove that the Walters could have been killed on February 20th. The jury could have found that Dr. Gulino's expert testimony was not credible. *See State v. Johnson*, 244 S.W.3d 144, 155–56 (Mo. banc 2008); *Smith v. State*, 148 S.W.3d 330, 336 (Mo. App. 2004). Therefore, the trial court did not err in denying [Petitioner's] motion for judgment of acquittal. Point II is denied.

*Wolfe*, 344 S.W.3d at 833-34 (alterations added); Doc. 11-15, pp. 17-19.

The Missouri Court of Appeals' resolution of Ground 2 is not objectively unreasonable. The state appellate court applied reasonably the correct standard before concluding that the State made a submissible case on all of the charges for which Petitioner was convicted. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (constitutional standard for judging sufficiency of the evidence in criminal trials is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"). Although Plaintiff argues that expert testimony he presented regarding the time of the victims' death contradicted the state's theory, the evidence presented by the state "need not exclude every reasonable hypothesis of

8

innocence. . . we may not disturb the conviction if the evidence rationally supports two conflicting hypotheses." *United States v. Anderson*, 78 F.3d 420, 422 (8th Cir. 1996). Insofar as Petitioner argues that his expert was more credible than those presented by the state, credibility determinations are left for the state courts to decide. *Graham*, 728 F.2d at 1540.

Because the state court's determination as to Ground 2 did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Ground 2 will be denied.

### Ground 3

In Ground 3, Petitioner claims that the trial court erred in admitting evidence concerning the caliber of ammunition found in the dumpster at the hotel, because the state failed to disclose the evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. 1, pp. 11-12. "To prove a *Brady* violation, a defendant must show that the prosecution suppressed evidence, the evidence was favorable to the accused, and the evidence was material to the issue of guilt or punishment." *United States v. Duke*, 50 F.3d 571, 577 (8th Cir.), *cert. denied*, 516 U.S. 885 (1995) (citing *Prewitt v. Goeke*, 978 F.2d 1073, 1078 (8th Cir. 1992)). The mere possibility that the undisclosed evidence might have influenced the jury does not establish materiality. *Knox v. State of Iowa*, 131 F.3d 1278, 1283 (8th Cir. 1997). "Rather, there must be a reasonable probability that its disclosure would have led to a different result at trial, thus undermining confidence in the jury verdict." *Id.*

The Missouri Court of Appeals, Southern District, denied Ground 3 as follows:

> During a search of the dumpster at the Williamsburg Inn, police found a pistol magazine in a trash bag. Water Patrol Officer Eric Gottman (Officer Gottman) recovered the item. The magazine was lying on top of loose .22 caliber cartridges and had a .22 cartridge sticking straight up out of the magazine. It was listed as a .22 caliber magazine

on the evidence form. During discovery, the evidence form and the magazine were provided to defense counsel and their firearms expert for their examination.

About two weeks prior to trial, a prosecutor visually inspected the magazine and concluded that it was for a .25 caliber weapon, rather than a .22 caliber weapon. During the cross-examination of Sgt. Teri Harmon, who was in charge of the Camden County evidence room, defense counsel asked whether the evidence form stated that a .22 caliber magazine had been found during the dumpster search. During a side-bar at the bench, the prosecutor said he believed the form was in error and the magazine was actually for a .25 caliber weapon. Defense counsel claimed there had been a discovery violation. The court decided to take the issue up later, and Sgt. Harmon was allowed to testify about what the evidence form stated.

During a break in proceedings, defense counsel filed a motion asking the court to prohibit Officer Gottman or any other witness from stating that the magazine was for a .25 caliber weapon. The motion asserted that there had been a discovery violation concerning the magazine. The prosecutor denied there had been a discovery violation because the evidence form and the magazine had been provided to the defense during discovery. The trial court denied the motion because "the magazine is whatever it may be and [Officer Gottman] may not be able to identify it even if he does see it."

During Officer Gottman's testimony, he described the items he found during his search of the dumpster at the Williamsburg Inn. One of those items was the pistol magazine. Because the magazine was lying on top of loose .22 caliber rounds and had a .22 caliber cartridge sticking up out of it, Officer Gottman assumed it was a .22 caliber magazine and listed it that way on the evidence form. He had never tried to load a .22 caliber cartridge in the magazine. When he tried to do so in court, the .22 caliber cartridge would not fit because it was too long for the magazine. He was able to properly load a .25 cartridge in the magazine. Officer Gottman testified that he had made a mistake in describing the magazine on the evidence form. Defense counsel cross-examined Officer Gottman about the mistake at length and impeached him with prior sworn testimony in which he had described the item as a .22 caliber magazine. The tenor of the cross-examination was that Officer Gottman had been sloppy in handling the evidence and that he had previously given unreliable testimony while under oath. During the subsequent testimony of the State's firearms expert, the court prohibited the prosecutor from asking that witness what caliber cartridge the magazine was designed to hold.

    . . . .

The trial judge concluded that there was no discovery violation here. That ruling was not an abuse of discretion. The defense was provided with the evidence form and the magazine during discovery. Counsel had the opportunity to have the magazine examined by their firearms expert. The prosecutor discovered the misidentification in the evidence form by visually inspecting the magazine itself, which defense counsel had the same opportunity to do. The prosecutor's mental impressions and conclusions about the

meaning and significance of the magazine were not subject to disclosure. Rule 25.10(A); *State v. Crespo*, 664 S.W.2d 548, 553 (Mo.App.1983) (where the State provided defense with a copy of a criminalist's report, there was no discovery violation; the prosecutor was not required to disclose his own conclusion that the results of the test appeared to be inaccurate). Neither was there a *Brady* due process violation. *See Gill v. State*, 300 S.W.3d 225, 231 (Mo. banc 2009). Defense counsel were provided with the magazine during discovery, which gave them the same means as the State to discover what caliber weapon the magazine fit.

Assuming arguendo that there was a discovery violation, [Petitioner] still is not entitled to relief . . . .

. . . . Here, the admission of Officer Gottman's testimony did not result in fundamental unfairness to [Petitioner]. No murder weapon was ever recovered. The State relied upon circumstantial evidence suggesting that a .25 caliber weapon was used to kill Leonard. The items recovered from the dumpster included a mix of both .22 caliber and .25 caliber ammunition. Defense counsel presented evidence that a hair found inside one of the boxes of .25 caliber ammunition belonged to Cox. During closing arguments, defense counsel argued that it was Cox who placed the discarded materials in the dumpster. During Officer Gottman's testimony, he admitted he made a mistake in describing the magazine. That change in testimony resulted in substantial cross-examination as to the thoroughness of his evidence collection, and the witness was repeatedly impeached with his own prior inconsistent sworn testimony.

After reviewing the record, we are unpersuaded that the admission of this evidence allowed the State to make a wholesale change in its theory, as claimed by [Petitioner]. We also are unpersuaded that this evidence allowed the State to "draw a line" between [Petitioner] and the murder weapon. Addington testified that [Petitioner] offered to sell a .25 caliber pistol in the middle of February, which tended to prove that [Petitioner] had access to such a weapon. Defense counsel admitted that [Petitioner] was staying at the Williamsburg Inn, where the .25 caliber ammunition was found in the dumpster. During interrogation, police asked [Petitioner] whether they would find the .25 caliber gun in the lake. [Petitioner] said, "[i]f you all can find a gun in the lake his hat's off to us." This evidence, which came from sources completely independent of Officer Gottman, tended to connect [Petitioner] to a .25 caliber weapon. Point III is denied.

*Wolfe*, 344 S.W.3d at 834-36 (alterations added); Doc. 11-15, pp. 19-23.

Initially, any argument by Petitioner that the prosecution violated Missouri's statutes governing discovery is not cognizable in federal habeas, because "federal habeas corpus relief does not lie for errors of state law." *Wilson v. Corcoran,* 562 U.S. 1, 5 (2010) (internal quotation omitted). Moreover, the state court reasonably found that there was no *Brady* violation, in that defense counsel were provided

with the magazine during discovery and there was other evidence that connected Petitioner to a .25 caliber weapon. *See U.S. v. Zuazo*, 243 F.3d 428, 430 (8th Cir. 2001) (holding that *Brady* is not violated where the government fails "to disclose evidence to which the defendant had access through other channels" or when the evidence from the undisclosed source "is cumulative of evidence already available.").

Because the state court's determination as to Ground 3 did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Ground 3 will be denied.

## Ground 4

In Ground 4, Petitioner argues that the trial court erred in admitting the inadmissible hearsay opinions and conclusions of the state's expert, Dr. Bennett. Doc. 1, pp. 12-13. Respondent argues that Petitioner procedurally defaulted Ground 4 by failing to preserve the claim for appeal and that the Missouri Court of Appeals' discretionary plain error review on the merits was reasonable. Doc. 9, pp. 8-9, 42.

"A habeas petitioner is required to pursue all available avenues of relief in the state courts before the federal courts will consider a claim." *Sloan v. Delo*, 54 F.3d 1371, 1381 (8th Cir. 1995), *cert. denied*, 516 U.S. 1056 (1996). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" before presenting those issues in an application for habeas relief in federal court. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "If a petitioner fails to exhaust state remedies and the

12

court to which he should have presented his claim would now find it procedurally barred, there is a procedural default." *Sloan*, 54 F.3d at 1381.

Petitioner procedurally defaulted Ground 4 by failing to make a specific hearsay objection at the time the evidence was offered. *Wolfe*, 344 S.W.3d at 837; Doc. 11-15, pp. 23-24. Although the Missouri Court of Appeals, at its discretion, reviewed this claim for plain error (*Wolfe*, 344 S.W.3d at 837), a state court's discretionary review for plain error does not excuse the procedural default of an unpreserved claim. *Clark v. Bertsch*, 780 F.3d 873, 875-77 (8th Cir. 2015) (citing *Hayes v. Lockhart*, 766 F.2d 1247, 1253 (8th Cir. 1985)). A federal court may not review procedurally defaulted claims "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioner fails to establish cause for the procedural default of Grounds 4. Instead, in his reply, Petitioner merely reargues the merits of the claim. Doc. 15, pp. 5-9. Even if Petitioner had alleged that the procedural default was caused by trial counsel's ineffective assistance, his claim would fail because claims of ineffective assistance of counsel must have been independently presented in a timely manner to the state courts in order to be used to show the alleged cause for a state procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Petitioner did not raise an independent claim of ineffective assistance of counsel on this issue in either his amended post-conviction motion or on post-conviction appeal. Doc. 11-17, pp. 15-47; Doc. 12-16.

Petitioner fails also to show that a fundamental miscarriage of justice will result if his defaulted claims are not considered. *See Abdi v. Hatch*, 450 F.3d 334, 338 (8th Cir. 2006) (a petitioner must present new evidence that affirmatively demonstrates that he is actually innocent of the crime for which he was convicted in order to fit within the fundamental miscarriage of justice exception), *cert. denied,*

13

549 U.S. 1036 (2006). Consequently, Ground 4 is procedurally defaulted and is denied.

## Ground 5

In Ground 5, Petitioner claims that the trial court erred in excluding the prior testimony of Roger Patterson, who testified in a deposition during Petitioner's first post-conviction proceedings but who died before Petitioner's second trial. Doc. 1, pp. 13-14. "Questions regarding admissibility of evidence are matters of state law, and they are reviewed in federal habeas inquiries only to determine whether an alleged error infringes upon a specific constitutional protection or is so prejudicial as to be a denial of due process." *Rousan v. Roper*, 436 F.3d 951, 958 (8th Cir.), *cert. denied*, 549 U.S. 835 (2006) (citing *Logan v. Lockhart*, 994 F.2d 1324, 1330 (8th Cir.1993)). Petitioner must show that "the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Id.*

The Missouri Court of Appeals, Southern District, denied Ground 5 as follows:

. . . . On March 27, 2001, Patterson was deposed during [Petitioner's] civil post-conviction proceeding. Patterson died on September 19, 2001. At trial, [Petitioner] offered Patterson's deposition from the post-conviction proceeding. The trial court excluded the deposition, and [Petitioner] filed written offers of proof. [Petitioner] argues that trial court's ruling deprived him of his right to present a defense because Patterson's testimony would have explained how Cox's story evolved and impeached Cox's testimony that she had no money trouble at the time of the robbery and murders.

. . . .

    In [Petitioner's] brief, he set out the information he sought to use from Patterson's deposition . . . .

. . . .

. . . . [Petitioner] claims that it "was crucial to [his] defense that Cox and [her then-boyfriend Alan] Fair were 'always' having money problems and 'always in arrears to somebody' " because "[t]his evidence would have helped the jury connect the dots pointing to Cox's culpability...."

    The record reflects that Cox was asked, on cross-examination, if she was "broke," and she responded "[m]aking bills, making enough for bills." Cox was also asked similar

14

questions and testified that "[w]e had enough to pay our bills," and "[w]e didn't have enough money, barely scraping by, but we didn't have no extra money." Although Patterson described Cox and Fair as having "money problems" and being in "arrears," he gave no further information to explain what he meant by those descriptions. The minor linguistic differences between Patterson's deposition testimony and Cox's answers on cross-examination do not persuade us that the jury would have had a markedly different understanding of Cox's financial situation in February 1997 if the deposition had been admitted. There was sufficient other evidence in the case to support [Petitioner's] argument that money concerns could have motivated Cox to commit the crimes for which [Petitioner] was charged.

The other excerpts of Patterson's deposition that [Petitioner] discusses are also cumulative to other evidence in the record. Cox testified that she was friends with Patterson and that Patterson and another friend picked her up from the hospital after the events happened. Cox also testified that [Petitioner] gave her $540, and said he would kill her, her relatives and everybody she knew if she told anyone what had happened. Cox admitted telling her friends a false story about being kidnapped. Because the evidence contained in Patterson's deposition was cumulative to a large quantity of evidence already in the record, the trial court did not abuse its discretion by excluding the deposition. Point V is denied.

*Wolfe*, 344 S.W.3d at 837-39 (alterations added); Doc. 11-15, pp. 24-27.

The state court made a reasonable determination that the trial court did not err in excluding Patterson's deposition because the testimony was cumulative to other evidence presented at trial. Moreover, because the evidence was cumulative and because Petitioner was otherwise afforded a full opportunity to cross-examine Cox, Petitioner fails to make the necessary showing that the state court's error in excluding the evidence had a "substantial and injurious effect or influence in determining the jury's verdict," *Yang v. Roy*, 743 F.3d 622, 628-29 (8th Cir. 2014); *see also Middleton v. Roper*, 455 F.3d 838, 857 (8th Cir. 2006) (factors for determining prejudice resulting from trial court error include "the importance of the witness's testimony to the entire case, whether the testimony was cumulative, whether corroborating or contradicting evidence existed, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case.").

Because the state court's determination as to Ground 5 did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

15

by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Ground 5 will be denied.

## Ground 6

In Ground 6, Petitioner claims that he was denied a full, fair, speedy, and unbiased appellate review of his convictions because the trial transcript was not properly certified by the court reporter. Doc. 1, pp. 14-15. As explained by the Missouri Court of Appeals, on July 16 and 17, 2008, the trial court conducted a hearing on the accuracy of the transcript, at which the court reporter, Margaret Jones, testified that, although she had previously certified that the transcript she prepared accurately reflected what occurred at trial, she no longer thought the transcript should have been certified. *Wolfe*, 344 S.W.3d at 839. Jones claimed some words were missing but was not able to identify any particular part of the transcript that she believed was in error. *Id*. Although the trial court entered an order on August 8, 2008, correcting any errors in the transcript and certifying that the transcript as corrected was accurate, Petitioner continued to assert that there were errors. *Id*. at 839-40. On August 18, 2008, the Court of Appeals ordered the trial court to resolve the remaining errors, which it did in its second order on September 10, 2008. *Id*. at 840. The corrected certified transcript and legal file were filed with the Missouri Court of Appeals on September 30, 2008. *Id*. The Missouri Court of Appeals then denied Petitioner's argument regarding the inadequacies of the transcript as follows:

> The thrust of [Petitioner's] argument is that Jones' testimony during the July 2008 hearing effectively undid her prior certification of the transcript. The trial court did not accept that argument, nor do we. It was up to the trial court to assess the credibility of Jones' testimony and the reasons why she claimed her prior certification was in error. The trial court did not find Jones believable. Jones' inability to point out a single error in the transcript likely played a large part in the trial court's decision. Given the judge's superior opportunity to determine Jones' credibility, we defer to that assessment. *State v. Haslett*, 283 S.W.3d 769, 783 (Mo. App. 2009). Once the trial court determined that the transcript had been properly certified, all other disputes about the correctness of the transcript were the responsibility of the trial court to settle. *See, e.g., State v. Formanek,*

16

792 S.W.2d 47, 48–49 (Mo. App. 1990). The judge did so. "Since the trial court has approved the transcript before us, we accept it as written." *State v. Hughes,* 748 S.W.2d 733, 740 (Mo.App.1988).

> As noted above, an incomplete record only requires reversal if the defendant is prejudiced. *Skillicorn,* 22 S.W.3d at 688. Claims of prejudice must be specific. *See State v. Christeson,* 50 S.W.3d 251, 271–72 (Mo. banc 2001); *Middleton,* 995 S.W.2d at 466. Here, [Petitioner] merely makes the general allegation that the certified transcript was inaccurate. [Petitioner] had the opportunity to raise all alleged errors with the trial court. There is no claim on appeal that the trial court erred in any specific way in ruling on the issues that [Petitioner] raised. [Petitioner] has not pointed out a single error relevant to any issue that he raised on appeal. Nor does he claim that an error in the transcript prevented him from raising other issues that he wished to assert. Based upon this Court's own thorough review of the record, our task has not been impeded by any alleged deficiencies in the certified transcript. In sum, [Petitioner] has failed to meet his burden of proving prejudice . . . .

*Wolfe*, 344 S.W.3d at 840-41 (alterations added); Doc. 11-15, pp. 30-31.

The trial court made a reasonable determination that Jones' testimony did not undo her prior certification of the transcript and that Petitioner was not prejudiced by any alleged inaccuracies therein. It appears from the record that any inaccuracies in the transcript were resolved by the state courts and, in his present petition, Petitioner does not point out a single error in the transcript that deprived him of a meaningful review on appeal. Doc. 1, pp. 14-15; *see Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) ('[P]etitioner must state specific, particularized facts which entitle him or her to habeas corpus relief for each ground specified.").

Because the state court's determination as to Ground 6 did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Ground 6 will be denied.

### Grounds 7 and 8

In Ground 7, Petitioner claims that trial counsel was ineffective for failing to investigate and

present evidence that someone other than Petitioner committed the murders. Doc. 1, pp. 15-16. In Ground 8, Petitioner claims that trial counsel was ineffective for failing to call Timothy and Joyce Whittle as witnesses to impeach Cox's testimony. Doc. 1, pp. 16-18.

In order for Petitioner to successfully assert a claim for ineffective assistance of trial counsel, Petitioner must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" and that "the deficient performance" actually prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). "A court considering a claim of ineffective assistance of counsel must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). Petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

To satisfy the prejudice prong, a petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. *Id.* at 694. This Court, moreover, may not grant habeas relief unless the state appellate court's decision "was contrary to, or an unreasonable application of, the standard articulated by the [United States] Supreme Court in *Strickland*." *Owens v. Dormire*, 198 F.3d 679, 681 (8th Cir. 1999), *cert. denied*, 530 U.S. 1265 (2000).

In denying Ground 7, the Missouri Court of Appeals set forth the proposed evidence suggesting that another individual, Mr. Smith, committed the murders, and denied Petitioner's claim as follows:

> Here, as the motion court found, the evidence presented by [Petitioner] did not include a witness with "any personal knowledge of [Mr.] Smith murdering [Mr. and Mrs. Walters] nor could [a witness] place him at the crime scene at any relevant time." Ms. Short, Mr. Proctor, and Mr. Tepikian each testified that they investigated and considered the defense that Mr. Smith was the murderer. . . . .

18

. . . .

The motion court did not clearly err in finding trial counsel's strategy reasonable. Trial counsel chose not to present a defense that they regarded as weaker than their other defenses and would involve presenting a witness they did not regard[] as credible. As the motion court observed, presenting such a defense would have actually "made the State's evidence against [Petitioner] seem stronger by comparison." None of the evidence cited by [Petitioner] placed Mr. Smith at the crime scene at the time of the murders. The absence of such evidence would have emphasized the significance of the tennis shoe-like print on the kitchen floor that was consistent with the tennis shoes recovered (along with black nylon pants) from the condominium storage shed after the custodian had seen [Petitioner] on the morning of February 20 wearing silky nylon pants. The criminalist's testimony excluding the .25 caliber handgun possibly associated with Mr. Smith as one of the murder weapons also supported trial counsel's strategy of focusing on the weaknesses in the State's case instead of trying to prove someone else's guilt by the use of even weaker evidence.

Because the motion court did not clearly err in finding that [Petitioner] failed to prove deficient performance, our inquiry ends . . . .

*Wolfe*, 446 S.W.3d at 747-50 (alterations added); Doc. 12-18, pp. 14-19.

In denying Ground 8, the Missouri Court of Appeals set forth the proposed testimony from

Timothy and Joyce Whittle and denied Petitioner's claim as follows:

At the evidentiary hearing, Ms. Short recalled that Ms. Whittle seemed "more credible" than Mr. Whittle. But when Ms. Whittle came to court appearing as she had been drinking and smelling of alcohol, trial counsel decided that they would not call her as a witness. Even though Ms. Whittle could have been brought back to court the following day—when she might or might not have appeared in a better state—Mr. Tepikian recalled that trial counsel questioned whether they should have even "called her in the first place" because they were concerned that she would not appear credible after "an aggressive [c]ross [-]examination." While Ms. Short thought Ms. Whittle's testimony was important, she also thought it important that Ms. Whittle appear credible to the jury, and Mr. Grothaus had testified that Ms. Whittle had a criminal history of her own, including a "history with drugs and alcohol." Ms. Whittle's credibility appeared in further doubt due to the condition in which she arrived at court. Based on this evidence, the motion court could rightly find that trial counsel's decision not to call her as a witness constituted reasonable trial strategy, especially when other reasonable trial strategies remained available and were pursued.

Mr. Tepikian did not remember "the circumstances related to [Mr. Whittle,]" but he recalled that both of the Whittles had credibility issues. The motion court found that Mr. Whittle was "not credible." Mr. Whittle acknowledged at least eight criminal convictions, and his sworn testimony was internally inconsistent.

19

The motion court did not clearly err in: (1) sharing trial counsel's belief that Mr. Whittle was not credible; (2) finding that trial counsel's decision not to call Ms. Whittle as a witness after she came to court smelling of alcohol and appearing as though she had been drinking was not unreasonable; and (3) finding that trial counsel was not ineffective by choosing not to call either of them as a witness at [Petitioner's] trial.

When strategic decisions are made by defense counsel after the law and relevant facts concerning plausible options are considered, they "are virtually unchallengeable[.]" *Strickland,* 466 U.S. at 690, 104 S. Ct. 2052; *Johnson,* 406 S.W.3d at 900.

*Wolfe*, 446 S.W.3d at 750-52 (alterations added); Doc. 12-18, pp. 19-23.

In holding that Petitioner's claims of ineffective assistance of trial counsel did not merit post-conviction relief, the state appellate court identified and applied reasonably the *Strickland* standard. Petitioner fails to establish that it was unreasonable for the state appellate court to find that trial counsel made reasonable strategic decisions in not presenting evidence that Mr. Smith committed the murders and not calling Timothy and Joyce Whittle as witnesses. *See Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir. 1987) ("[T]he courts must resist the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed . . . and his best judgment as to the attitudes and sympathies of judge and jury."); *see also Shaw v. U.S.*, 24 F.3d 1040, 1042 (8th Cir. 1994) (trial counsel's reasonable trial strategies cannot constitute ineffective assistance, even if they are unsuccessful). Finally, insofar as the state courts found that defense counsel were credible and that Mr. Whittle lacked credibility, credibility determinations are left for the state courts to decide. *Graham*, 728 F.2d at 1540.

Because the state court's determinations as to Grounds 5 and 6 did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. §2254(d)(1) and (2), Grounds 5 and 6 will be denied.

20

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." *Tennard v. Dretke*, 542 U.S. 274, 276 (2004). Because Petitioner has not met this standard, a certificate of appealability will be denied. *See* 28 U.S.C. § 2254, Rule 11(a).

Accordingly, it is **ORDERED** that:

(1) the petition for writ of habeas corpus is denied;

(2) a certificate of appealability is denied; and

(3) this case is dismissed with prejudice.

/s/ Roseann Ketchmark
ROSEANN KETCHMARK
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated:  November 10, 2015 .

Case 4:15-cv-00472-RK   Document 17   Filed 11/10/15   Page 21 of 21